**Application of Simon L. RUSKIN.**
**Patent Appeal No. 7451.**

United States Court of Customs
and Patent Appeals.
Jan. 6, 1966.
Rehearing Denied March 10, 1966.

Smith, J., dissented.

James H. Callahan, Ralph L. Chappell, New York City, John F. Smith, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (Irving R. Pellman, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

Simon L. Ruskin appeals from the decision of the Board of Appeals affirming the rejection of claims 13–17 of appellant's application [1] for "Fossil Fuels." No claims have been allowed. The sole rejection is lack of utility under 35 U.S.C. § 101 because of inoperativeness.

The subject matter here claimed is a method for increasing the energy release of fossil fuels such as coal and petroleum upon combustion.

Claim 13, which is sufficient for purposes of this opinion, reads as follows:

The process of treating a fossil fuel to increase its energy release on subsequent combustion comprising passing said fuel in a fluid suspension under a pressure of about 150 to about 300 psi through a magnetic field of about 10,000 Gauss for a time sufficient to substantially increase the diamagnetic properties of said fuel.

The following references were relied upon:

Black et al. 2,845,388 July 29, 1958
Selwood, Magnetochemistry 407 (1956)

Appellant's claims have been rejected solely upon the ground that the process is inoperative for the purpose alleged and therefore lacks utility. It appears from the record that the examiner appropriately apprised the appellant as to his doubt concerning the operability of the process. This doubt seems to have been engendered by several factors: (1) The generally speculative nature of the scientific field to which the claimed subject matter relates; (2) the rather grandiose words used in certain instances to describe the results achieved by the invention, and (3) the absence of even one example containing data supporting the statements as to the results obtained by the invention. A request by the examiner for comparative data in support of appellant's allegations of utility was not complied with. The Board of Appeals affirmed, finding that the examiner entertained a reasonable doubt that the process was operative for the purpose alleged and that such doubt had not been removed by the production of proof relating thereto.

The issue presented by this appeal is whether one of ordinary skill in the art would be satisfied that the process as disclosed and claimed is operative.

A process is operative if it produces its intended result. Although there was perhaps some misconception on the part of the examiner and the board as to what was "the intended result" of appellant's process, it appears to us that it was to *increase* the energy release of fossil fuel upon combustion.

1. Serial No. 703,228, filed December 16, 1957.

There are isolated statements in the specification to the effect that the energy release is "vastly enhanced" and that the claimed process provides a 2 to 20-fold increase in the available energy of fossil fuel. However, considering that the degree of utility is immaterial (see our discussion in In re Nelson, 280 F.2d 172, 47 CCPA 1031, we believe that a process which *would* produce an increase in the energy release of fossil fuel upon combustion would be an operative process within the meaning of section 101.

Generally stated, the specification describes a number of transformations which occur in the molecular structure of fossil fuels when exposed to a magnetic field having a strength of about 5,000–10,000 Gauss either alone or in conjunction with gamma irradiation. The following excerpt from the specification describes these transformations in detail:

> To accomplish my invention I proceed to disrupt the colloidal masses and subject these particles to diamagnetic dispersion so that they become milled to particles of 2 to 4 microns. By this procedure of diamagnetic milling, a substantial part of the symmetrical molecular structures become antisymmetrical and at this stage greatly enhanced release of energy occurs during combustion. To secure a still greater combustion effect, I may irradiate these small particles with gamma irradiation from an isotope source. Irradiation from 1 million R to 400 million R or more may be employed with increasing energy availability on combustion.

> In effecting combustion of these carbon compounds, I secure free orbital circulation of the electrons and with it higher thermal activity. To do this I try to create the most favorable conditions for molecular rearrangements and atomic nuclear rearrangements. Generally, one thinks

of the nucleus as strongly coupled to both electron spin and electron orbital motion. These effects are secondary in molecules because the chemical bonds suppress the free orbital circulation of the electrons and pair off the electron spins. Under the influence of my diamagnetic dispersion, a slight shift in resonance frequency is produced which may also be called a chemical shift, depending on the bonding, particularly in the presence of pi bonding. The electron spin coupling leads to an indirect spin coupling of one nucleus with other nuclei in the same molecule and may be manifested through structure on the resonance lines. Chemical shifts also depend on such nuclear electronic environment as the ionic character of the chemical bonds and the magnetic anisotropy of the molecules. The electrostatic interacting will also produce paramagnetic shifts, particularly those caused by hydrogen bonding. Under these conditions, chemical interactions occur with even explosive violence and great liberation of energy. One might in a way compare it with a more controlled release of atomic and molecular energy.

> The increased reactivity also leads to the ready formation of peroxides with high release of energy. Thus anthracine derivatives readily form, under the conditions of my process, peroxides with oxygen, particularly in the 9–10 position.

Also, dimerization and instability will occur combining in two dimensional layers as follows:

Thus by inducing as much as possible a disordered solid state, I enhance the thermal combustion value of my fossil fuel to a very great extent.

In considering the thermochemistry of the molecule, it is known that the heat of combustion of a C—C bond is 50.8 kg. cal. per mole, while that of a C=C bond is 118.8, and of a C—H bond 53.3 kg. cal. per mole. Under the diamagnetic effect induced by my process, loosely bound electrons which have no fixed position, introduce into the molecule a degree of resonance that enhances the heat of combustion. Thus abnormally high diamagnetic anisotropy is attained and the diamagnetic currents are not restricted to single atoms but circulate along orbits of considerable length. In this fashion these molecules are closely analogous to supraconductors [sic].

In addition, the specification contains seven examples describing experiments in which the process as set forth in claims 13–17 was performed. In two of these examples, it is stated that less ash remains after combustion of treated fuel than after combustion of untreated fuel. However, no *data* are presented as to the actual energy release of treated fuel. Nor are there any data comparing the energy release of treated and untreated fuel.

The Selwood reference, which was cited to show the state of the art, reads in pertinent part as follows:

It is well known that the *ortho-para* hydrogen conversion is catalyzed at a measurable, and sometimes fairly high, rate by substances which are considered to be diamagnetic. The rapid conversion by charcoal is one example, and the slow but measurable conversion by supposedly pure lanthana is another. There have been some claims that the susceptibility of lanthana changes with the method of preparation, but the results have been disputed. These effects have led to the idea that some diamagnetic solids might possess a kind of "surface paramagnetism." Actually this is less mysterious than might be suspected. Charcoal has been shown * * * by paramagnetic resonance to possess strong absorptions corresponding to unpaired electrons, and Sandler has shown that the *ortho-para* hydrogen conversion on titanium dioxide, which is diamagnetic, is due to some superficial reduction to the paramagnetic sesquioxide. It is probable that all examples of so-called surface paramagnetism may be rationalized by some such explanation as those given.

More difficult to understand is the claim that the velocity of *ortho-para* hydrogen conversion over nickel metal is altered by application of an external magnetic field. The changes are not very great, ranging up to a 10 or 12% increase with fields up to 18,000 oersteds. The effect is said to be measurable in the earth's field.

The possibility that a magnetic field might have an effect on chemical reactivity has received attention for many years. Although some interesting effects had been reported, until very recently none contributed very much to our understanding of

either magnetism or chemical kinetics. Earlier work has been reviewed by the writer and will be described here very briefly. There are theoretical reasons for believing that a magnetic field of sufficient intensity might influence the velocity and equilibrium for certain types of reactions. These types are those such as, for instance, the reduction of chromate to cromic ion by a sugar, in which a substantial change of magnetic susceptibility occurs. Many such reactions have been investigated. Positive results are reported by Bhatnagar and, in every case, the change observed is small.

The Black et al. patent relates to a method for stabilizing petroleum distillate by exposure to, inter alia, gamma irradiation. In reference to Black et al., the examiner stated:

> While it is known that gamma radiation will cause some change in structure (Black et al.) of fuel it does not necessarily follow that the available thermal energy of the fuel will be two to twenty times greater * * *. Certainly volatile substituents will result from the treatment.

The examiner took the position that the theory set forth in the specification as to the transformations which occur in fossil fuel, together with the statements to the effect that less ash remains upon combustion of treated fossil fuels, were insufficient to prove that the claimed process produced the alleged results in view of the speculative nature of magnetochemistry, the scientific field to which the subject matter relates.

Appellant's arguments are two-fold. First, he argues that the specification does contain comparative data sufficient to prove that the alleged results are achieved, the comparative data being the statements (1) that the process results in a 2 to 20-fold increase in the available energy of fossil fuels and (2) that less ash remains upon combustion of such fossil fuels. Second, appellant considers that the references cited to show the state of the art, together with the interpretation given these references by the examiner, indicate the operability, not inoperability, of the process as disclosed and claimed.

Upon consideration of the record before us, we find ourselves in agreement with the position of the examiner and the board. Appellant's so-called comparative data is not data in the technical sense but simply conclusory statements as to the alleged results of his process. The record does not present a very clear picture of the actual state of the art to which the subject matter relates. The references fail to support fully either a conclusion of operativeness or inoperativeness. The Selwood reference is of some help since it does discuss generally the effect of a magnetic field on chemical reactivity. Where the issue is operability, however, it is not necessary that a reference prove with certainty that the claimed invention will or will not operate in the manner intended. The Selwood reference does indicate the infancy of the field of magnetochemistry and most importantly the inconclusive nature of the efforts in the field at the time the article was written.

Considering the state of the art as reflected by the cited references, we do not believe that the disclosure of the application as filed, being devoid of quantitative data, was sufficient to satisfy one having ordinary skill in magnetochemistry that the process as disclosed and claimed was operative. Accordingly, the examiner was justified in requiring further evidence on this issue. Since his request was not complied with, we must affirm the board's decision.

Affirmed.

SMITH, Judge (dissenting).

We are not here dealing with an esoteric type of invention where operability strains the credibility of one of ordinary

skill in the art. Rather, appellant asserts merely that the energy release of fossil fuels may be increased through the application of known scientific principles. In this concept there are no scientific mysteries. I cannot state one reason why it is not to be believed. The majority, while alluding to the "state of the art," fails to state any reason why the process disclosed is not operable. In the absence of any such reason, I think it unreasonable to require appellant to build a plant in order to develop data to submit in support of his position. I believe one of ordinary skill in the arts most directly related to the claimed invention would find the statements in the specification to be scientifically credible and would consider the claimed invention to be operable.

I would, therefore, reverse the appealed rejection.