**W.L. GORE & ASSOCIATES, INC., Plaintiff,**

v.

**GARLOCK, INC., Defendant.**

Nos. C79–2074, C80–174.

United States District Court, N.D. Ohio, E.D.

Feb. 6, 1987.

David Pfeffer, Morgan, Finnegan, Pine, Foley & Lee, New York City, Albert Knopp, Baker & Hostetler, Cleveland, Ohio, for plaintiff.

John J. Mackiewicz, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia, Pa., William Ginn, Thompson, Hine & Flory, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On November 2, 1979 and February 7, 1980, W.L. Gore & Associates, Inc. ("Gore") filed the above-captioned cases alleging patent infringement by Garlock, Inc., defendant. Jurisdiction is proper under 28 U.S.C. § 1338(a)[1] and 35 U.S.C. § 281.[2] On February 28, 1980, the parties stipulated to consolidation of the cases for trial. From June 23, 1982 to July 22, 1982, they tried the cases to the Court, which on November 19, 1982 issued a decision rendering some claims of the patents invalid. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 220 U.S.P.Q. 220 (N.D.Ohio 1982). On November 14, 1983, the Court of Appeals affirmed in part and reversed in part. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The case is currently before the Court on remand from the Court of Appeals to determine whether Garlock has infringed on the patents. Pursuant to Fed.R.Civ.P. 52(a),[3] the following findings and conclusions are entered on these issues.

### I.

There are two (2) patents at issue: United States Letters Patent Number 3,953,566 ("the '566 patent") and United States Letters Patent Number 4,187,390 ("the '390 patent"). The '566 patent teaches processes for producing porous products, whereas the '390 patent describes inventions in porous products. Robert W. Gore is the inventor of these processes and products, and Gore is the owner of these patents.

Gore contends that Garlock uses processes which infringe claims three (3) and nineteen (19) of the '566 patent. They state:

3. A process for the production of a porous article of manufacture of a polymer of tetrafluoroethylene which process comprises expanding a shaped article consisting essentially of highly crystalline poly(tetrafluoroethylene) made by a paste-forming extrusion technique, after removal of lubricant, by stretching said unsintered shaped article at a rate of about 100% per second and maintaining said shaped article at a temperature between about 35°C and the crystalline melt point of said tetrafluoroethylene polymer during said stretching.

19. A process for the production of a porous article of manufacture of a polymer of tetrafluoroethylene which process comprises expanding a shaped article consisting essentially of highly crystalline poly(tetrafluoroethylene) made by a paste-forming extrusion technique, after removal of lubricant, by stretching said unsintered shaped article at a rate ex-

---

1. 28 U.S.C. § 1338(a) provides:
   The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents....

2. 35 U.S.C. § 281 provides:
   A patentee shall have remedy by civil action for infringement of his patent.

3. Fed.R.Civ.P. 52(a) provides:
   In all actions tried upon the facts without a jury ..., the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58....

ceeding about 10% per second such that its final length in the direction of expansion is greater than about five times the original length, and maintaining said shaped article at a temperature between about 35°C and the crystalline melt point of said tetrafluoroethylene polymer during said stretching.

Garlock has argued that these claims are invalid and alternatively that its processes do not infringe them.

Gore alleges that Garlock makes, uses, and sells products which infringe claims fourteen (14), eighteen (18), thirty-five (35), thirty-six (36), forty-three (43), sixty-seven (67), and seventy-seven (77) of the '390 patent. These state:

14. A porous material in the form of a film consisting essentially of polytetrafluoroethylene polymer, which material has a microstructure characterized by nodes interconnected by fibrils and has a matrix tensile strength in at least one direction above 9290 psi, which material has been heated to a temperature above the crystalline melt point of said polymer and has a crystallinity below about 95%.

18. A porous material in the form of continuous filaments consisting essentially of polytetrafluoroethylene polymer, which material has a microstructure characterized by nodes interconnected by fibrils and has a matrix tensile strength in at least one direction above 9290 psi, which material has been heated to a temperature above the crystalline melt point of said polymer and has a crystallinity below about 95%.

35. A laminated structure comprising (a) a first shaped article formed of a porous material made of a tetrafluoroethylene polymer, which material has a microstructure characterized by nodes interconnected by fibrils and has a matrix tensile strength in at least one direction above about 7,300 psi, and (b) a second shaped article bonded to said first shaped article.

36. The structure of claim 35 in which said first shaped article is formed of a porous material which has a matrix tensile strength in at least one direction of at least 9290 psi, and has a crystallinity below about 95%.

43. A porous material made of a tetrafluoroethylene polymer, which material has a microstructure characterized by nodes interconnected by fibrils, which material (a) has a matrix tensile strength in at least one direction above about 9290 psi, (b) has been heated to a temperature above 327°C and has a crystallinity below about 95%, and (c) has a dielectric constant of 1.2–1.8.

67. An impregnated structure comprising

(a) a shaped article formed of a porous material made of a tetrafluoroethylene polymer which material has a microstructure characterized by nodes interconnected by fibrils and has a matrix tensile strength in at least one direction above about 9290 psi, and

(b) a polymer impregnated within the pores of the said shaped article.

77. The structure of claim 35 in which the first shaped article is a sheet having pores that will pass a gas but will not pass liquid water.

As with the claims of the '566 patent, Garlock has argued invalidity and noninfringement.

## II.

The '566 patent teaches a process for the production of porous products of polytetrafluoroethylene ("PTFE"). Gore alleges that Garlock infringes by using three (3) processes to make PTFE products; the processes are those for making the products—PLASTOLON film, PTFE filament, and PLASTI–THREAD tape. Garlock counters that its processes are not within the claims of the '566 patent.

### A.

■ Garlock argues that its processes do not infringe because they involve stretching PTFE at rates less than the minimum rate which the '566 patent teaches, that is, for claim 19 at rates less than ten percent (10%) per second and for claim 3 at rates less than one hundred percent (100%) per second.

The parties dispute what the term, "rate of stretch," means. Gore urges that it is the percent of stretch divided by the time of stretching. Garlock proposes that it means the change in velocity with respect to distance along a stretched sample. In the initial decision, this Court held that the evidence of these conflicting understandings of "rate of stretch" showed that the term was indefinite and thus the claims were invalid. *Gore,* 220 U.S.P.Q. at 235.

The Court of Appeals reversed. It decided that there was uncontradicted evidence of the meaning of the term, "rate of stretch." *Gore,* 721 F.2d at 1556. It reasoned that a finding of indefiniteness must focus on what the language of the claim meant to those skilled in the art at the time when an inventor files the patent application, here that is May 21, 1970.[4] *Id.* The Court of Appeals declared that "rate of stretch" means percent of stretch divided by time of stretching. *Id.*

Because this matter is before the Court on remand, the law-of-the-case doctrine bars reconsideration of the holdings of the Court of Appeals. *Smith International, Inc. v. Hughes Tool Co.,* 759 F.2d 1572, 1576 (Fed.Cir.), *cert. denied,* 474 U.S. 87, 106 S.Ct. 87, 88 L.Ed.2d 71 (1985). Garlock characterizes the holding of the Court of Appeals as addressing whether Garlock sustained its burden of proving claims of the Gore patent invalid. It argues that the statement about "uncontradicted evidence" was not a decision but rather was dicta.

Based upon this reading of the opinion of the Court of Appeals, Garlock argues additionally that the Court may and should disregard the testimony of Dr. Carleton A. Sperati, the expert of Gore, who testified that "rate of stretch" means percent of stretch divided by time of stretching. It suggests that his testimony was biased and emphasizes a portion of that testimony on which the initial decision relied and which Garlock characterizes as the "epitome of self-contradiction, improbability and imprecision."

Although Garlock established some prior relationship between Dr. Sperati and W.L. Gore, Robert Gore's father, that relationship does not support the allegation of such bias as would warrant disregard of the testimony or its characterization by Garlock as "obscured ... by distortions and half-truths." Rather, the Court finds that Dr. Sperati made an objective analysis and testified forthrightly.

As to Dr. Sperati's confusion during cross-examination, Garlock mischaracterizes for what the Court quoted that testimony. In the initial decision, the Court quoted Dr. Sperati in support of the conclusion that the '566 patent would not enable one skilled in the relevant art to practice its teachings because the critical lower limit of the "rate of stretch" at which the '566 process functioned properly was greater than that quantified in the patent. Thus, the quotation exemplified this conclusion by demonstrating that if Dr. Sperati, an expert, were confused when considering this unquantified limit, then those skilled the relevant art would have been confused also. Indeed, this use of Dr. Sperati's testimony demonstrates its probativeness and the reliance of the Court on it.

Moreover, the decision of the Court of Appeals about "uncontradicted evidence" was not dicta. "A decision is the law of the case not only with respect to 'ques-

---

**4.** Contrary to the assertions of Garlock, the Court of Appeals reversed the finding in the initial opinion of who was a person of ordinary skill in the relevant art. In the initial opinion, the finding was that such a person would be an "individual familiar with the stretching of thermoplastic films and fibers." *Gore,* 220 U.S.P.Q. at 234. In holding that the claims of these patents were not obvious from the prior art, the Court of Appeals decided that "the district court erred in not taking into account the import of the markedly different behavior of PTFE from that of conventional thermoplastic polymers clearly established and undisputed on the record, and in thus disregarding the unpredictability and unique nature of the unsintered PTFE to which the claimed inventions relate...." *Gore,* 721 F.2d at 1550 (citation omitted). This holding as to obviousness undermines the finding as to who was a person of ordinary skill in the relevant art. Accordingly, the Court finds that a person of ordinary skill in the relevant art at the time of the filing of the patent application was an individual familiar with the stretching of PTFE.

tions in terms discussed and decided' but also questions decided by necessary implication." *Smith* at 1577.

If the meaning of "rate of stretch" were open to interpretation, then the Court of Appeals would have remanded to redetermine the question of indefiniteness. It did not; rather, it excluded as irrelevant, both expressly and implicitly, all evidence of the meaning of the term which Garlock now argues. It expressly rejected the competency of Dr. Robert Armstrong, Garlock's expert, to testify on this issue, and it expressly rejected the probativeness of "the post-filing date development of varying formula" on the issue. Moreover, because it did not remand to determine whether the claims were indefinite, it implicitly rejected the relevance of other evidence in the record. Important in this conclusion is the maxim of patent law that "claims ... must be construed in the identical way for both infringement and validity." *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1449 (Fed.Cir.1984). Here, the Court of Appeals has held that for purposes of determining validity, "rate of stretch" means percent of stretch divided by time of stretching; for purposes of determining infringement, this Court must apply the same definition.

### B.

■ Garlock has stipulated that the process by which it produces PLASTOLON film meets each element of claim nineteen (19) of the '566 patent except that of "rate of stretch." It does not dispute that if "rate of stretch" means percent of stretch divided by time of stretching and that if Dr. Sperati's testimony is accepted, Gore has proved infringement.

Dr. Sperati based his calculations on the stipulated facts. Those calculations show that the process for making PLASTOLON film stretches a PTFE article at a rate in excess of ten percent (10%) per second as claim nineteen (19) of the '566 patent requires. Thus this process of Garlock is

within the claim, and the Court holds that it infringes the '566 patent. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

### C.

Gore argues that Garlock infringes claim nineteen (19) of the '566 patent by the process with which it manufactures its PTFE filament. Gore relies on Dr. Sperati's testimony. He testified that this process meets every element of claim nineteen (19), including the requirement that it first stretch PTFE at a rate greater than ten (10) percent per second and then heats it to a temperature above 327°C.[5] Garlock responds that its process involves simultaneous stretching and sintering and contends that Dr. Sperati's testimony to the contrary is incredible.

Dr. Sperati conducted *inter partes* tests on the process and testified that it entails first stretching PTFE at a rate greater than ten (10) percent per second and then sintering it. The parties agree that the process consists of a roller which feeds unstretched PTFE into an oven and of a roller which pulls the PTFE out of the oven at a rate greater than that at which the first roller feeds it. Dr. Sperati testified that he measured the length, thickness, width, and mass of the PTFE, the time that passed while the PTFE traveled from the input to the output roller, and the velocity of the input and output rollers. From this data, he computed the rate of stretch as to each point in time during which the PTFE was in the oven. Additionally, Dr. Sperati determined the point in time at which sintering of the PTFE began. He compared the initial length of a PTFE sample to its final length after the process and used his personal experience as to the effects on PTFE which result from its sintering. From his personal experience and this examination of Garlock's finished product, he determined at what point during the stretching process the sintering of the

---

**5.** Heating PTFE above 327°C, its crystalline melting points, is known as "sintering" the poly- mer.

PTFE began. Lastly, Dr. Sperati computed the rate of stretch at the time when the PTFE began sintering and concluded that it was a rate greater than ten (10) percent per second. Accordingly, if accepted, Dr. Sperati's testimony establishes that claim nineteen (19) of the '566 patent describes Garlock's process, including that it entails first stretching the PTFE at a rate greater than ten (10) percent per second and then sintering it.

Garlock argues that Dr. Sperati's testimony is not credible. For instance, it says that the process entails stretching and sintering PTFE simultaneously because the temperature inside the oven is greater than the crystalline melting point of the PTFE. Yet, Garlock ignores the fact that sintering involves heating the PTFE itself above its crystalline melting point. Garlock admits that the PTFE enters the oven at room temperature but does not explain how or why it would instantaneously heat up to its crystalline melting point so that all stretching in the oven occurs simultaneously with sintering. Dr. Sperati's testimony explains how he determined when the PTFE reached this temperature and what stretching occurred before it did so.

Additionally, Garlock contends that its cross-examination discredited Dr. Sperati. Yet Garlock did not inquire as to the specifics of the formulas which Dr. Sperati used to determine the rate of stretch from the data that he compiled. Rather Garlock merely asked Dr. Sperati whether he measured the temperature of the PTFE as it passed through the oven; he testified that he did not and could not do so. Nonetheless, he is an expert qualified to analyze a process such as that of Garlock. His testimony and conclusions are consistent with and based on empirical data. Garlock does not challenge the data or Dr. Sperati's calculations other than than by innuendo and bald assertions of incredibility. The Court finds his testimony credible and reasonable.

Garlock also argues that if this process were held to infringe claim nineteen (19) of the '566 patent, then the claim would be invalid. It bases this argument on a state-ment by Dr. John F. Lontz, one of its experts at trial, which the initial decision quoted. *Gore,* 220 U.S.P.Q. at 229. Dr. Lontz opined that Garlock practiced what an earlier patent, the Smith patent, disclosed, that is, simultaneous stretching and sintering. The initial decision held that claim nineteen (19) of the '566 patent was anticipated by the prior art; that decision did not hold that the Smith patent alone disclosed what was claimed as novel. Moreover, the opinion does not express reliance on Dr. Lontz's testimony in finding claim nineteen (19) anticipated; rather the decision expressed reliance on other evidence. *Gore,* 220 U.S.P.Q. at 231. The appellation of dicta, which Garlock would apply to the statement of the Court of Appeals as to the meaning of "rate of stretch," is more appropriate for this quotation in the initial decision than for that statement by the Court of Appeals. Moreover, the decision of the Court of Appeals forecloses reliance on Dr. Lontz's testimony. It reversed the holding of anticipation of claim nineteen (19) and held that claim nineteen (19) differs from that which the Smith patent discloses in that the Smith patent does not disclose any rate of stretch and teaches that if PTFE is heated above its crystalline melting point, it may be stretched up to four (4) times its length. In contrast, claim nineteen (19) teaches that PTFE may be stretched more than five (5) times its length by stretching it at a rate greater than ten (10) percent per second at temperatures below its crystalline melting point. Although the Court quoted Dr. Lontz's testimony, that quotation was not relied upon in finding anticipation of claim nineteen (19), was dicta, and is precluded by the opinion of the Court of Appeals.

Dr. Sperati's testimony was more credible, and based upon it, the Court finds that the process of Garlock for making its PTFE filament infringes claim nineteen (19).

**D.**

Gore argues that Garlock has infringed claim three (3) of the '566 patent by its process for manufacturing PLASTI–

THREAD tape. Gore relies on Dr. Sperati's testimony that this process satisfies each element of claim three (3), including that of a "rate of stretch" of "about 100% per second." In regard to the "rate of stretch," Dr. Sperati testified that he relied upon data that Garlock provided and that he "consider[ed] a rate somewhere between 76½ percent a second and 139 percent a second, with no way of determining more exactly just what that rate is, to be about 100 percent a second." Tr. 787–88. Unlike Dr. Sperati's study of the process for manufacturing PTFE filament, he did not conduct tests of this process and did not examine samples of PTFE before and after going through it. His conclusion does not establish that this process meets the literal terms of claim three (3). *Graver Tank, supra.* Moreover, his testimony does not establish infringement under the doctrine of equivalents. That doctrine requires a showing that an accused process "performs substantially the same function in substantially the same way to obtain the same result" as does the patented process. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 760–61 (Fed.Cir.1984) (*quoting Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 859). The record does not contain evidence comparing the results obtained from practicing the process taught in claim three (3) to those obtained by this process of Garlock, and Dr. Sperati's testimony does not address this issue. Accordingly, Gore has not sustained its burden of proof on showing equivalency, and the Court holds that Garlock does not infringe claim three (3) of the '566 patent by its process for manufacturing PLASTI–THREAD tape.

### III.

The '390 patent describes inventions of porous products of PTFE. Gore alleges that four (4) products infringe the '390 patent; they are:

1) PLASTOLON film,

2) KLIMATE rainwear fabric,

3) PTFE filament, and

4) LATTICE BRAID packing material.

The PLASTOLON film and the KLIMATE rainwear fabric are related products, in that the fabric is a laminate of which the first layer is the film. Similarly, the filament and the packing material are related, in that the filament is the essential ingredient of the packing material. Gore argues that specific claims of the patent describe each of these products.

### A.

Gore argues that Garlock infringes claims fourteen (14) and forty-three (43) of the '390 patent by making and selling PLASTOLON film. It relies on Dr. Sperati's testimony, a sales brochure of Garlock, and the deposition testimony of the manager of the plant where Garlock manufactures the film. If accepted, this evidence demonstrates literal infringement.

■ It is clear that the film meets some of the elements of the claims. Both claims describe a product which has been heated above its crystalline melting point; the testimony of the plant manager establishes this element. Both claims describe a product which is porous and characterized by a particular microstructure; Dr. Sperati's testimony demonstrates these elements and is corroborated by the sales brochure. Additionally, claim forty-three (43) describes a product which has a dielectric constant within a particular range; Dr. Sperati testified that the PLASTOLON film meets this requirement. Garlock has not disputed that the film meets each of these elements, and the Court finds that it does.

■ As to the KLIMATE rainwear fabric, Gore argues that Garlock infringes claims thirty-six (36) and seventy-seven (77) of the '390 patent by inducing and contributing to the manufacture and sale of this product.[6] These claims describe a laminate

---

**6.** Gore argues that Garlock both induced and contributed to the infringement of claims thirty-six (36) and seventy-seven (77). Inducement gives rise to liability under 35 U.S.C. § 271(b), which provides:

Whoever actively induces infringement of a patent shall be liable as an infringer.

This provision of section 271 has a broad scope and imposes liability on one who aids and abets a literal infringement. *Power Lift, Inc. v. Lang Tools, Inc.,* 774 F.2d 478, 481 (Fed.Cir.1985).

of which the first layer has the same microstructure as the product which claims fourteen (14) and forty-three (43) describe. Because PLASTOLON film is that layer of the fabric, the fabric meets this element of the claim. Additionally, claim seventy-seven (77) describes the first layer as having "pores that will pass a gas but will not pass liquid water;" Dr. Sperati testified to this property of the PLASTOLON film. Garlock has not contested that the fabric meets these elements of claims thirty-six (36) and seventy-seven (77), and the Court finds that it meets them.

Garlock challenges two elements of all four claims; they are:

1) that a product has a "matrix tensile strength" "above" or "of at least" either 7300 or 9290 pounds per square inch and

2) that it has a crystallinity "below about 95%."

Gore relies on Dr. Sperati's testimony to establish these elements; Garlock responds by offering new evidence and proposing a new line of cross-examination of the doctor.

Dr. Sperati testified that he had examined and tested a sample of PLASTOLON film and that in determining its matrix tensile strength, he used the formula which the '390 patent specifies. That formula sets forth the relationship of three (3) pieces of data from which the value of the matrix tensile strength is derived; these three (3) pieces of data are

1) the tensile strength of the porous specimen,

2) the specific gravity of the polymer which makes up the porous specimen, and

3) the specific gravity of the porous specimen.

Dr. Sperati concluded that PLASTOLON film has a matrix tensile strength which meets the requirements of these claims.

Additionally, he testified that it has a crystallinity below ninety-five (95) percent.

Garlock contends that Dr. Sperati's testimony does not establish infringement. It argues that he may have used the wrong standards in determining the values for the three (3) pieces of data with which he computed the matrix tensile strength and that he used the wrong method in determining crystallinity. Garlock offers to prove what is the correct method for determining crystallinity. Garlock did not explore these arguments during its cross-examination of the doctor. Rather, it has created them from its analysis of a report of the doctor on the accused processes and products.

At the time of trial, Gore offered that report as evidence, Garlock objected, and the Court sustained the objection. Before trial, Garlock received a copy of the report and thus had it available for cross-examination. More than four (4) years have passed from the time of trial, and thus if the Court were to allow cross-examination of the doctor on these issues, it would be unfair to both Gore and the doctor. Garlock has not advanced any reasons which would justify permitting such cross-examination based on the report, nor any which explains its failure to do so at trial; its arguments based on this excluded piece of evidence are without merit. The Court finds that Dr. Sperati's testimony on the matrix tensile strength and crystallinity of PLASTOLON film was credible.

Garlock argues that the Court should construe the claims of the '390 patent to include as an element, the "rate of stretch" of the process by which the products described were made. Without addressing whether the law would permit such a construction, the Court finds it factually without merit. As discussed above, Garlock manufactures PLASTOLON film by a process in which the "rate of stretch" is greater than ten (10) percent per second. Ac-

Garlock developed PLASTOLON film with the knowledge that Kenyon Piece Dyeworks, Inc., the manufacturer of the KLIMATE rainwear fabric, would use it in manufacturing the fabric. Moreover, Garlock wrote to and urged prospective customers to purchase the KLIMATE rainwear fabric. As discussed below, that fabric literally infringes claims thirty-six (36) and seventy-seven (77), and the Court finds that Garlock induced the infringement. Accordingly, the Court need not and does not determine whether Garlock contributorily infringed under 35 U.S.C. § 271(c).

cordingly, this implied process limitation would be no defense for Garlock.

Lastly, Garlock proposes that if the Court were to find infringement by these products, then it would have to hold the claims invalid because the properties of these products are the inherent result of a process described in a Japanese patent, the Sumitomo patent. Garlock suggests construction of what it terms imprecise phrases, such as "above 9290 psi" or "above about 7300 psi;" it would construe those phrases to read above "12,000 psi." It concludes that by this construction the validity of the claims will be maintained because the process of the Sumitomo patent does not produce products which inherently have matrix tensile strengths above this value.

■ This argument flaunts the mandate of the Court of Appeals. The initial decision adopted it precisely in finding invalidity. *Gore*, 220 U.S.P.Q. at 233 n. 31. The Court of Appeals reversed and held:

> [T] teachings of ... Sumitomo [do not] place the products claimed in the '390 patent in possession of the public. The teachings of ... Sumitomo are so unacceptably vague concerning characteristics of products produced by ... [its process] as not to support an anticipation rejection. That fact is confirmed by the PTO's having fully considered ... [this reference] and by ... [the PTO's] having issued the '390 patent over ... [it].

*Gore*, 721 F.2d at 1554. The Court of Appeals remanded to determine infringement. The arguments and proof which Garlock advance would be probative of the anticipation defense which the Court of Appeals rejected; they cannot be used to avoid the express holding of the Court of Appeals by characterizing the result as construction to avoid invalidity.

Gore has shown and the Court holds that Garlock infringes claims fourteen (14) and forty-three (43) of the '390 patent by making and selling PLASTOLON film and that it has induced the infringement of claims thirty-six (36) and seventy-seven (77) by developing and selling PLASTOLON film for use in the KLIMATE rainwear fabric.

## B.

■ Gore alleges that Garlock has infringed claims eighteen (18) and sixty-seven (67) of the '390 patent by making and using its PTFE filament and by making and selling its LATTICE BRAID packing material. As to these allegations, Dr. Sperati testified that he had examined and tested these products, that claim eighteen (18) describes the PTFE filament, and that claim sixty-seven (67) describes the LATTICE BRAID packing material. Garlock does not challenge his conclusions, and the Court finds that these claims do describe the accused products.

Nonetheless, Garlock contends that it is not liable for infringement because if it were, the Court would have to hold the patents invalid. It argues that the initial decision found that the process by which it makes its PTFE filament is the same process which the Smith patent discloses and concludes that it has the right to practice what the Smith patent teaches. As discussed above, this characterization of the initial decision is incorrect and would contravene the holding of the Court of Appeals. Accordingly, the Court holds that Garlock infringes the '390 patent by making and using its PTFE filament and by making and selling its LATTICE BRAID packing material.

## IV.

■ In conclusion, the Court holds that Garlock has infringed the '566 patent and the '390 patent. This Memorandum of Opinion does not address nor resolve whether Garlock has wilfully infringed these patents, what damages, if any, Gore has proved resulted from the infringement, and whether Gore is entitled to attorneys fees and costs for this litigation. However, at this time, partial injunctive relief is appropriate. 35 U.S.C. § 283.[7] Garlock is

---

7. 35 U.S.C. § 283 provides:

The several courts having jurisdiction of cases under this title may grant injunctions in ac-

using presently its process for making PLASTOLON film and is marketing and selling that film. Accordingly, it is appropriate to enjoin these ongoing infringements. *Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1564 (Fed.Cir.1984). On the other hand, Garlock no longer makes its PTFE filament nor sells its LATTICE BRAID packing material, and thus an injunction is not necessary. *Id.*

IT IS SO ORDERED.

## ORDER

Pursuant to the Memorandum of Opinion issued in the above-captioned case this date, the Court holds that:

1. Garlock infringes claim nineteen (19) of United States Letters Patent Number 3,953,566 by its process for making PLASTOLON film;

2. Garlock infringed claim nineteen (19) of United States Letters Patent Number 3,953,566 by the process that it used from the Fall 1978 to December 31, 1980 to make its PTFE filament; and

3. Garlock does not infringe United States Letters Patent Number 3,953,566 by the process with which it makes PLASTI–THREAD tape.

Additionally, the court holds that:

1. Garlock infringes United States Letters Patent Number 4,187,390 by making and selling PLASTOLON film;

2. Garlock induces the infringement of United States Letters Patent Number 4,187,390 by making and selling PLASTOLON film for use in the KLIMATE rainwear fabric;

3. Garlock infringed United States Letters Patent Number 4,187,390 by making and using its PTFE filament from the Fall 1978 to December 31, 1980;

4. Garlock infringed United States Letters Patent Number 4,187,390 by making and selling its LATTICE BRAID packing material from the Fall 1978 to December 31, 1980.

cordance with the principles of equity to prevent the violation of any right secured by

Accordingly, Garlock is enjoined from using its process for making PLASTOLON film and from making, marketing, or selling that film.

IT IS SO ORDERED.

patent, on such terms as the Court deems reasonable.